IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| BROOKTROUT, INC. | § | |
| Vs. | § | CIVIL ACTION NO. 2:03-CV-59 |
| EICON NETWORKS CORPORATION, ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

**1.      Introduction.**

In this patent infringement case, the plaintiff has filed a motion for a permanent injunction based on the jury's verdict. The requested injunction is too broad, as it would preclude the sale of a product with multiple non-infringing uses. The court therefore grants in part and denies in part Brooktrout's motion for a permanent injunction for the reasons expressed in this order.

**2.      Factual Background and Procedural Posture**.

The plaintiff, Brooktrout Inc. ("Brooktrout"), filed this patent infringement case against the defendants, Eicon Networks Corporation and Eicon Networks, Inc. (collectively "Eicon"), claiming that Eicon induced the infringement of the patents-in-suit by encouraging others to use Eicon's Diva Server product in configurations which infringed the patents-in-suit. The patents-in-suit are addressed to the routing of inbound facsimile transmissions using direct inward dial ("DID") numbers.

The case proceeded to trial solely on a theory of induced infringement. A theory of inducement, however, necessarily required proof of direct infringement. The plaintiff's expert, Dr.

Thomas Rhyne, explained the plaintiff's direct infringement theory as follows:

> Q: So, can you describe what is required to actually infringe the Giler patent?
>
> A: Basically you've got to have a phone connection that's going to come in and provide DID service. You have got to have a computer to service the fax server. I mentioned for example a Dell server. You have got to have the Diva card, it's got to be properly configured and interfaced to a piece of software that we tend to call the fax server software. You have heard the names of several companies that make them, Esker, GFI, these are companies that sell the software, and that software when properly configured with the list of names and phone numbers and mailboxes meets the requirement. So, you have got to have those things together.
>
> Q: And are you aware of examples of such a system?
>
> A: I think I have got–based on a study that both–that I guess primarily you and your law firm and I'm not sure what participation Brooktrout was in it there have been five companies around the United States that have been identified that have exactly one variation of that system or another. They have got an Eicon Diva card, they have somebody's fax software, they have a computer, and they are, in fact, using it to received faxes and pass them to mailboxes all of the time.

Tr. Transcript, November 3, 2004, p. 283, ll. 2-24.

Under the plaintiff's direct infringement theory, the fax application software completes significant steps in the methods of the asserted claims. Dr. Rhyne explained:

> A: . . . In this case, the application that we're talking about are these fax server applications that reach down into the card and pull out the fax and put it into a directory of some kind, and then using the digits say, here is the fax, and send them to the right mailbox.

*Id.* at 285, ll. 20-25. As Dr. Rhyne's testimony reveals, it is only when the Diva Server card is combined with multiple other components and used in connection with the inbound routing of facsimile transmissions using DID numbers that the claims of the patent are directly infringed.

As foreshadowed by the quoted testimony of Dr. Rhyne, the plaintiff's liability and damages case relied on a showing that five users of the Diva Server directly infringed certain claims of the

patents in suit by actually using the Diva Server with applications software for the inbound routing of facsimile transmissions using DID. These users included Alcon Labs, BellSouth, Kimberly Clark, TAG/TMI, and NRI Staffing Resources. In addition to these five customers, the evidence, viewed in the light most favorable to the jury's verdict, suggests that many other users of the Eicon Diva Server card will purchase fax application software and configure the product and software to route incoming facsimile transmissions using DID. Stated another way, it is virtually undisputed (and this court has assumed) that a significant number of end-users of the Diva Server will use it to directly infringe the patents-in-suit. The court has also assumed that the defendants in this case know "to a moral certainty" that many United States users of its product will configure it in infringing systems.

Any view of the evidence, however, must account for the undisputed fact that the Diva Server, standing alone, does not infringe any claim of the patents-in-suit. Dr. Rhyne's testimony was unequivocal on this point:

> Q: Okay. Now, does the Eicon Diva Server card all by itself infringe any of the claims of the Giler patent?
>
> A: Absolutely not.
>
> Q: Why not?
>
> A: Well, because the way Mr. Giler's claims were written, they really claimed the system that actually have–he actually has two types of claims. One type is called an apparatus claim which deals with hardware, and the other one is a method claim which deals with how you use something. And in both cases his claims encompass not just the card, but also the rest of the system that receives the DID numbers and makes the association to the computer network location that in this case I have illustrated as a mailbox. So, you have got to have more than just the card.

*Id.* at 282, l. 13-283, l. 1. Any view of the evidence must also accept the undisputed fact that the Diva Server has multiple non-infringing uses, including its ability to route voice calls and to facilitate

3

outbound facsimile transmissions.

In addition to its evidence of direct infringement by the five specific users of the Diva Server, the plaintiff offered evidence which tended to show that Eicon had induced infringement of the patents-in-suit. First, the plaintiff pointed to a technical document, or white paper, which explained the Diva Server's ability to accept and route inbound facsimile transmissions onto computer networks using DID. The plaintiff also pointed to the defendants' business associations with application software vendors, including those who write fax application software. Furthermore, the plaintiff proved the existence of various user manuals available on the defendants' United States and international web sites which showed how to configure the Diva Server to accept DID signals in connection with facsimile transmissions. Finally, the plaintiff showed that the card itself was configured, before trial, to default to DID settings.

The jury also heard evidence from Eicon that it did not intend to induce anyone to infringe the patents and did not even know about the patents until early 2003. Eicon urged that it modified its United States web site, took down the white paper, re-programmed its default settings, and put warnings to users on its product. Eicon urged that these facts, considered collectively, demonstrated its lack of intent to induce the infringement of the patents in suit.

The jury found Eicon liable for inducing infringement of the patents-in-suit. To return its findings of induced infringement, the jury necessarily found that the defendants had encouraged, at a minimum, some of their customers to engage in activity which directly infringed the claims of the patent in suit. The jury awarded damages in the amount of $94,500 for past infringement. The jury failed to find that the defendants' infringement was willful, and the jury failed to find that the asserted claims were invalid.

Based on the jury's findings of induced infringement, Brooktrout seeks the following permanent injunction against the defendants:

> Eicon Networks Corporation, Eicon Networks, Inc., and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise shall be permanently enjoined from inducing infringement of United States Patent Nos. 5,291,546 and 5,488,651 by encouraging, supporting, aiding, or abetting the use of the Eicon Diva Server in a fax server for the inbound routing of faxes based on dialed telephone numbers. Eicon Networks Corporation and Eicon Networks, Inc. are hereby ordered, at its option, to either (a) cease all Diva Server sales into the United States channel (via United States distributors or resellers) or (b) modify the Diva Server to disable DID capability for fax calls. Nothing in this Order shall prohibit Eicon Networks Corporation and Eicon Networks, Inc. from selling the Diva Server for use in systems that they have verified will not infringe United States Patent Nos. 5,291,546 and 5,488,651.

The court's decision, set forth below, follows the parties' briefing on the motion and an evidentiary hearing.

**3.      Discussion.**

   **A.      Legal Principles Applicable to Injunction Requests.**

The right conferred by a patent is the right to exclude others from making, using, or selling the claimed invention. Permanent injunctions ordinarily should issue following a finding of infringement absent a sound reason for denying an injunction. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1246-47 (Fed. Cir. 1989). The general rule notwithstanding, the scope of a permanent injunction is within the court's discretion. Although an injunction should provide the patentee with meaningful relief, the order should not impose unnecessary restraints on lawful activity. *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1365-66 (Fed. Cir. 1998)("Judicial restraint of lawful noninfringing activities must be avoided."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993) .

The principles governing remedial relief cannot be divorced from the liability setting in which they arise. The Diva Server does not, standing alone, infringe any asserted claim, and the plaintiff restricted its case solely to one of induced infringement. Moreover, not all customers use the Diva Server in infringing configurations, and even those that do may put the Diva Server to substantial non-infringing uses. Therefore, the scope of any injunction must be consistent with the Federal Circuit's observations in *Dynacore Holdings v. U.S. Philips Corp.*, 363 F.3d 1263, 1275-76 (Fed. Cir. 2004).

In *Dynacore*, the court considered a claim of induced infringement in a suit concerning network components. The court relied on the general rule that the "mere sale of a product capable of substantial non-infringing uses does not constitute indirect infringement of a patent." *Id.* at 1275. The court held that the plaintiff in the case needed to demonstrate that LANs compliant with a particular IEEE standard necessarily infringed the patent in suit or point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance. *Id.* at 1275-76. In particular, the court stated:

> A defendant's liability for indirect infringement must relate to the identified instances of direct infringement. Plaintiffs who identify individual acts of direct infringement must restrict their theories of vicarious liability– *and tie their claims for damages or injunctive relief* –to the identified act. Plaintiffs who identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category.

*Dynacore*, 363 F.3d at 1274-75 (internal citations omitted)(emphasis added). Bearing these standards in mind, the court now addresses the plaintiff's claim for injunctive relief.

**B.     Application.**

At trial, Brooktrout proved that five specific users of the Diva Server had configured the

product with the necessary other components (application software, computers, etc.) to infringe the asserted claims of the patents. Brooktrout's requested injunction, however, goes far beyond these specific instances of conduct. Relying on *Dynacore*, Brooktrout contends that it is entitled to a broad injunction because it has shown that a "class" of infringers exists. Brooktrout defines the class to be all users of the Diva Server who receive inbound faxes using DID. The class so defined, Brooktrout asks for an injunction barring the United States sales of Eicon's product into its distribution channel. Alternatively, Brooktrout would require Eicon to modify the card to render it incapable of use in an infringing configuration. *Dynacore* counsels the court to reject this argument and narrowly tailor the scope of the requested injunction.

      Brooktrout has not shown that a class exists sufficient to justify its proposed injunction. This is true even though the evidence submitted at trial persuades the court that more than five users directly infringe the patents-in-suit and that Eicon is aware of that infringement. The problem is that Brooktrout locates its class by defining it in terms of users who perform the methods of the asserted claims. This approach renders *Dynacore's* first option (the identification of specific infringers) meaningless. Rather than tying claims for injunctive relief to specific instances of direct infringement, a patentee could always avoid *Dynacore* by pointing to a single infringer for liability purposes and, in the remedial phase, presenting a class of "all customers who use the product to perform claim limitations a, b, and c." *Dynacore* does not permit this approach.

      Under different facts, the court might be persuaded to issue a broader injunction. If, for instance, the evidence persuaded the court that all (or even nearly all) of the defendant's customers *necessarily* used the product to perform the claimed invention, then a class of infringers might exist sufficient to justify a ban on future sales of the product. A court is justified in issuing such relief if

the court is persuaded that such a ban is necessary to stop future infringement even though the order has the ancillary effect of preventing some lawful uses. *See National Instruments Corp. v. The Mathworks, Inc.*, 113 Fed. Appx. 895 (Fed. Cir. 2004). Such facts do not exist in this case.

Brooktrout suggests, however, that its requested injunction does not necessarily foreclose the sale of the Diva Server in the United States. Brooktrout observes that under the terms of the proposed order, Eicon has the option to modify its Diva Server to disable its infringing capabilities. Brooktrout argues that inducement to infringe is, after all, infringement at law, and the burden should properly rest on Eicon to modify its product to further reduce or eliminate the likelihood that downstream purchasers of its product will use the card to complete infringing systems.

There are two problems with this argument. The first is *Dynacore*. Under these facts, an injunction ordering the modification of the Diva Server is tantamount to an injunction banning the United States sales of the Diva Server in its current state. This relief is contrary to a fair reading of *Dynacore*. The second problem is one of practicalities. Brooktrout has not shown that its proposals are technologically and commercially feasible. At the hearing on the injunction, Brooktrout suggested alternative approaches to this issue; however, these untested approaches, coupled with the court's concern that the injunction would unduly impair many lawful non-infringing uses, counsel the court to reject Brooktrout's request for an order requiring Eicon to modify its Diva Server so that end purchasers cannot use the card to complete infringing systems.

In filings made after the injunction hearing, Brooktrout requests the opportunity to engage in further discovery on the modification issue.[1] Brooktrout seeks Eicon's source code to demonstrate

---

[1] *See* Brooktrout's Supplemental Brief in Support of its Motion for a Permanent Injunction and Conditional Motion to Compel Diva Server Source Code (#189).

8

the feasibility of its proposed modifications. The court rejects this request. Primarily, the court is persuaded that the injunction it will issue is sufficient to stop the threat of the defendants' future unlawful conduct. It must be remembered that the mere sale of the Diva Server in its current form, without any encouragement to infringe the patents, does not constitute unlawful conduct. Thus, injunctive relief, narrowly crafted to stop *encouragement*, while avoiding undue interference with lawful conduct, is appropriate. As a secondary matter, it is simply too late in the case to re-open discovery on this issue. The feasibility of modifications has been an issue for some time in this litigation. *See* Deposition of Simon Capper, taken September 14, 2004. Even if the court were persuaded it should order a modification of this product, the court is not convinced that the request for discovery is timely. It is therefore denied.

The court has fully considered the impact of the Supreme Court's recent decision in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 125 S.Ct. 2764 (2005). That case dealt with liability for copyright infringement arising from the distribution of peer-to-peer file sharing software. The software did not infringe any copyright. It was a thieves tool used by those engaged in the enterprise of file-swapping. The lower courts had held that the defendants were not subject to vicarious liability for copyright infringement and granted summary judgment. The Court reversed. The Court held that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties. The Court held that to the extent the lower courts had relied on *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) to mandate their holdings, the courts had misapprehended that rule. In reaching its decision, the court viewed the totality of the evidence in the case, which included the defendants' marketing activities, their

customer base, and the extent to which users of the software relied on it to engage in wholesale appropriation of protected works. That evidence warranted a finding that the defendants' conduct went beyond the mere sale of an article capable of both illicit and lawful uses. *Metro-Goldwyn-Mayer* thus addressed liability for indirect copyright infringement, not the scope of injunctive relief following trial on the merits. Of course, a district court would be justified in fashioning broad injunctive relief on liability facts similar to those present in *Metro-Goldwyn-Mayer*. But nothing in *Metro-Goldwyn-Mayer* mandates an injunction prohibiting the future sales of product following any finding of induced infringement.

At the hearing, Brooktrout urged that an injunction awarded in a patent case must provide the patentee with meaningful relief. Indeed, the Federal Circuit has held that a court granting an injunction may "not properly deny the one element of such relief that would be necessary to make it effective." *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1564 (Fed. Cir. 1984); *Kaspar Wire Works, Inc. v. K-Jack Engineering Co.*, 70 F.3d 129 (Fed. Cir. 1995)(unpublished). The question of meaningful *remedial* relief, however, must be considered in light of the *liability* facts proven at trial as well as the extent to which the court concludes that the scope of the requested relief will impair lawful activity. There is also a place in the equation for the court to consider the product at issue and how it relates to the patent claims asserted in the case. Finally, contrary to Brooktrout's suggestions, the jury's findings as to the extent of infringement are pertinent to this issue. Here, the jury awarded damages in the amount of $94,500 in the context of a claim which originally exceeded $2,000,000. That same jury rejected Brooktrout's arguments that the infringement was willful. The court has considered these findings when fashioning the scope of the injunction in this case. Nothing in this order would preclude Brooktrout from pursuing others,

10

such as any developers of fax application software, who actively aid or abet infringing activity. In the end, however, Brooktrout's request goes beyond what the court believes is necessary to deter future unlawful conduct, and the proposed order has a significant impact on lawful activity. The court will not issue it.

**D.     Conclusion.**

After carefully considering the parties' arguments, the court is persuaded that Brooktrout is entitled to that portion of its requested injunction which enjoins Eicon from "inducing infringement of United States Patent Nos. 5,291,546 and 5,488,651 by encouraging, supporting, aiding, or abetting the use of the Eicon Diva Server in a fax server for the inbound routing of faxes based on dialed telephone numbers." Brooktrout is also entitled to injunctive relief banning Eicon's future sales of its Diva Server card to the five specific customers proven at trial. Brooktrout is further entitled to an injunction prohibiting Eicon from engaging in the specific activities proven at trial to constitute inducement of infringement. The court will therefore enjoin Eicon from publishing any document to be distributed in the United States which contains any instructions to users explaining how to configure the Eicon Diva Server in a manner which enables the user to use the Diva Server to route inbound facsimile transmissions onto computer networks using DID. In this regard, the court will also enjoin Eicon from publishing any such document on any website accessible from any location within the United States. Eicon will also be ordered to publish warnings on its Diva Server product which are displayed to the user that the use of the Diva Server to route inbound facsimile transmissions using DID is likely to infringe certain claims of the patents in suit. *C.R. Bard, Inc. v. United States Surgical Corp.*, 258 F. Supp.2d 355, 364 (D. Del. 2003)(ordering warnings to user of product). Eicon will also be ordered to publish these warnings in a prominent location on any user's

manual distributed with any Diva Server sold into the United States. Finally, the court will enjoin Eicon from assisting in or supporting the development of any application software sold in the United States which enables the Diva Server card to be used for the inbound routing of facsimile transmissions onto computer networks using DID. These restrictions are sufficient to guard against the threat of future unlawful conduct.

    SIGNED this 25th day of July, 2005.

                                                          *T. John Ward*
                                                          T. JOHN WARD
                                                          UNITED STATES DISTRICT JUDGE